UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Cassius Lamar Shine,      :
          Plaintiff,      :
                          :
     v.                   :      File No. 2:06-CV-237
                          :
Robert Hofmann, Susan     :
Blair, Jodie Chafee, Cindy :
Modiano, Kevin Ashburn,   :
Nick Burnham,             :
          Defendants.     :

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Papers 61, 62, 63 and 68)

Plaintiff Cassius Lamar Shine, proceeding *pro se*,
claims that his constitutional rights were violated while he
was in custody awaiting his federal criminal trial.  Pending
before the Court are Shine's request for a pre-trial
conference, motion for appointment of counsel, and motion *in
limine*.  Also pending before the Court is the defendants'
partial motion for summary judgment.  For the reasons set
forth below, I recommend that the motion for partial summary
judgment be GRANTED.  Shine's motions are DENIED without
prejudice.

## Factual Background

During the time period relevant to this lawsuit, Shine
was a federal pre-trial detainee in the custody and care of
the Vermont Department of Corrections ("DOC").  His

complaint sets forth a series of constitutional claims, some of which have already been dismissed.

The complaint alleges that on or about November 14, 2005, Shine wrote a letter to his attorney discussing the conditions of his confinement and his criminal defense. The conditions of confinement issue had to do with the alleged lack of fire sprinklers in his living area. Shine claims that because he had complained about this issue in the past, his mail was intercepted, opened and read by corrections officer Cindy Modiano. Modiano then brought the letter to Shine and asked him to confirm that he was its true sender. The complaint alleges that Modiano's conduct constituted unlawful retaliation, and denied Shine access to the courts. The Court has dismissed the access to the courts claim, while the retaliation claim is a subject of the defendants' current summary judgment motion.

Shine's second claim is that the lack of sprinklers presented dangerous living conditions in violation of his constitutional rights. On December 5, 2005, he filed a grievance concerning the facility's alleged non-compliance with state building codes. After an investigation, prison personnel concluded that no action was needed because the

unit had smoke detectors and fire extinguishers, and a
sprinkler system was due to be installed in 2005.
Nonetheless, Shine claims that prison Superintendent Sue
Blair and Maintenance Supervisor Jodi Chafee "falsified
safety records and were deliberately indifferent to state
building codes placing plaintiff's life in danger.
Plaintiff had no access to a fire extinguisher and would
have perished in flames in a calamity before help could
arrive." (Paper 4 at 6). This claim is also a subject of
the pending summary judgment motion.

Shine next alleges that, in retaliation for filing a
grievance, Blair and DOC Commissioner Robert Hofmann
transferred him to the Southern State Correctional Facility
("SSCF") in Springfield, Vermont. Once at SSCF,
Superintendent Blair allegedly placed Shine in "close
custody . . . without the possibility of ever being released
into general population." The complaint alleges that, while
in close custody, Shine was not allowed adequate access to
legal materials and was denied all access to religious
services and educational/vocational programs. Id. at 6-7.
Again, the access to courts claim has been denied, while the
retaliation claim remains pending.

Shine further claims that defendant Kevin Ashburn ordered that he be placed in automatic lock down while in close custody. The procedures used to place Shine in lock down allegedly violated his due process rights because "there was no impartial reviewing body to discern on a case by case basis whether close custody is warranted for the individual." Id. at 7. In a related claim, Shine alleges that his placement in disciplinary segregation impeded his ability to present a defense to the criminal charges pending against him. The Court has dismissed the disciplinary segregation claim, ruling that placing a pre-trial detainee in disciplinary segregation is not a *per se* violation of substantive due process. The remainder of Shine's due process claim is now before the Court.

Shine's final allegations arise out of an alleged assault by a correctional officer. On January 26, 2006, Shine was mopping his cell when he was allegedly assaulted from behind by defendant Nick Burnham. Burnham proceeded to call Shine a "'hard headed nigger'" when, after being ordered to stop mopping, Shine continued to mop. Burhnam then sprayed Shine with mace in his face and eyes. In addition to the claim against Burnham, Shine is suing

Superintendent Kevin Ashburn for failure to protect him from Burnham, "a racist who hated blacks and who had previously assaulted another black inmate." Id. at 8. The defendants have not moved for summary judgment on the claim against Burnham.

For relief, Shine is seeking damages and injunctive relief in the form of (1) an order barring Burnham from working inside any prison, (2) required racial sensitivity training for all prison staff members, and (3) the discontinuation of close custody for federal pre-trial detainees in DOC custody.

The defendants' motion for partial summary judgment is opposed, discovery is closed, and according to the scheduling order currently in effect the case is ready for a trial date to be set. Accordingly, Shine has filed a request for a pre-trial conference, a motion for appointment of counsel, and a motion *in limine* with respect to the admissibility of his prior crimes or other misconduct. The Court will first address the summary judgment motion.

## Discussion

I. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil

Procedure, a motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried, and that the undisputed material facts warrant judgment for the moving party as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006); Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112, 116 (2d Cir. 2006).  The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Once a properly-supported motion for summary judgment has been made, the burden shifts to the non-moving party to make a sufficient showing to establish the essential elements of that party's case on which it bears the burden of proof at trial.  Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003).

The non-moving party must put forth "specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and

draw all permissible factual inferences in favor of the party against whom summary judgment is sought.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 219 (2d Cir. 2004).  Nevertheless, a party opposing a motion for summary judgment cannot rely on mere speculation or conjecture.  <u>See</u>, <u>e.g.</u>, <u>Conroy v. N.Y. State Dep't of Corr. Servs.</u>, 333 F.3d 88, 94 (2d Cir. 2003) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.").  If a plaintiff is proceeding *pro se*, courts are to construe the complaint and other pleadings liberally.  <u>See</u>, <u>e.g.</u>, <u>Williams v. Edwards</u>, 195 F.3d 95, 96 (2d Cir. 1999).

II.  <u>Close Custody Confinement</u>

The defendants' motion first seeks summary judgment on Shine's claim that his placement in close custody violated his procedural due process rights.  Shine alleges that

> [d]efendant Kevin Ashburn implemented procedures against plaintiff because he was a 'pre-trial' prisoner in federal custody which solicit [sic] automatic lock down in close custody of all pre-trial inmates.  These procedures denied plaintiff due process because there was no impartial reviewing body to discern on a case by case basis whether close custody is warranted for the individual.

(Paper 4 at 7).  Shine describes his incarceration at the time as "lock down 23 hours a day with no privileges." (Paper 72 at 11).

In response to Shine's allegations the defendants have submitted an affidavit from Ashburn, who was Superintendent at Vermont's Southern State Correctional Facility ("SSCF") when Shine arrived there in January 2006.  Ashburn explains that custody classification is determined by means of a score, "with points added and subtracted based upon criteria set by the Director of Classification at the Department of Corrections."  According to Ashburn, when Shine was transferred to SSCF he received additional points for "the severity of his current offense, for conviction for a Major A disciplinary infraction within the previous 12 months, for having more than 2 felony convictions, and for having a current detainer based upon pending federal charges."  Shine also received several point reductions for no escape attempts within the prior six months, no Major A disciplinary convictions in the previous six months, and for having his GED.  "The total score, after adding and subtracting the points for the foregoing, placed Mr. Shine in close custody."  (Paper 68-5 at 1).

Ashburn further states that SSCF had a "close custody management team" that could override an inmate's score "if the team determines that the inmate poses no security threat based on the inmate's behavior and institutional adjustment." Shine did not receive such an override. Id. at 1-2.

Procedural due process claims are analyzed in two steps. First, courts must determine whether there exists a liberty or property interest that has been interfered with by the state. See Bd. of Regents v. Roth, 408 U.S. 564, 571 (1972). "Protected liberty interests 'may arise from two sources - the Due Process Clause itself and the laws of the States.'" Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989) (quoting Hewitt, 459 U.S. at 466). Second, courts examine whether the procedures provided prior to a given deprivation were constitutionally sufficient. See Hewitt v. Helms, 459 U.S. 460, 472 (1983).

The defendants argue that Shine had no protected liberty interest because "[t]here are no statutes or regulations that create a liberty interest in not being confined to close custody status." (Paper 68 at 11). Shine has not contested this assertion. However, DOC

Administrative Directive 410.06 suggests that an inmate is entitled to a hearing before being placed in closed custody. Specifically, the "Procedural Guidelines" section of this Directive provides that "[i]nmates pending a classification hearing for placement in close custody shall be placed in Administrative Segregation pending their hearing or awaiting transfer to a close custody housing unit."[1]

In Wilkinson v. Austin, 545 U.S. 209, 222 (2005), the Supreme Court confirmed that "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in Sandin [v. Connor, 515 U.S. 472 (1995)]." The Second Circuit has held that "Sandin does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process." Iqbal v. Hasty, 490 F.3d 143, 163 (2d Cir. 2007), reversed on other grounds in Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Benjamin v. Fraser, 264 F.3d 175, 188-89 (2d

_____

[1] These regulations were not submitted by the parties, but are accessible at the DOC's website. The Court notes that, unlike the detailed procedures for administrative segregation, there is no other reference in this Directive to either close custody or lock down status.

Cir. 2001)).  Thus, under Directive 410.06, a pre-trial detainee in Vermont may be entitled to due process relative to his placement in close custody regardless of whether such custody satisfies the Sandin standard.

Aside from any state policy or regulation, the force of the Due Process Clause itself protects pre-trial detainees from restrictive confinement.  See Kentucky Dep't of Corr., 490 U.S. at 460.  In Bell v. Wolfish, a substantive due process case, the Supreme Court noted that a detainee "may not be punished prior to adjudication of guilt in accordance with due process of law."  441 U.S. 520, 535 (1979). Moreover, in Benjamin, the Second Circuit cited case law holding that pre-trial detainees have a right to procedural due process in connection with any form of punitive segregation.  264 F.3d at 188 (citing Mitchell v. Dupnik, 75 F.3d 517, 523 (9th Cir. 1996) (pretrial detainees may only be subjected to disciplinary segregation if they are provided a due process hearing); Whitford v. Boglino, 63 F.3d 527, 531 n.4 (7th Cir. 1995) (pre-trial detainees "may not be punished without due process of law regardless of state regulations")).  Whether a particular restriction amounts to punishment turns on a number of factors

including:

> Whether the sanction involves an affirmative
> disability or restraint, whether it has
> historically been regarded as punishment, whether
> it comes into play on a finding of scienter, ...
> whether an alternative purpose to which [the
> restriction] may rationally be connected is
> assignable for it, and whether it appears
> excessive in relation to the alternative purpose.

Bell, 441 U.S. at 538 (citation omitted).

In this case, Shine was placed in close custody and
lock down based upon his personal history.  That history
included (1) that he had violated disciplinary rules within
the last 12 months, and (2) that he was a federal pretrial
detainee.  While special confinement based upon a
disciplinary violation rings of punishment, so does
segregating pre-trial detainees based on nothing more than
their status as detainees.  See Bell, 441 U.S. at 520
("punishment that may not constitutionally be inflicted upon
[pre-trial] detainees *qua* detainees.").

Close custody confinement appears to be a higher level
of custody than placement in general population, and thus
does more than merely ensure the detainee's presence at
trial.  See Griffith v. Hofmann, 2008 WL 4682690, at *5 (D.
Vt. Oct. 21, 2008) (close custody allows two hours of
recreation per day, access to legal materials, and phone

calls).  Lock down suggests an even higher level of custody,
possibly equivalent to administrative segregation.  See id.
(administrative segregation permits one hour of recreation
per day).  Accordingly, Shine's placement could be
considered punitive, thus raising due process concerns.[2]

Further, the defendants have offered no penological
justification for using federal pre-trial detainee status as
a factor in close-custody determinations.  In a substantive
due process analysis, "[a]bsent a showing of an expressed
intent to punish, the determination whether a condition is
imposed for a legitimate purpose or for the purpose of
punishment 'generally will turn on whether an alternative
purpose to which [the restriction] may rationally be
connected is assignable for it, and whether it appears
excessive in relation to the alternative purpose assigned
[to it].'"  Benjamin, 264 F.3d at 188 (alteration in
original) (quoting Bell, 441 U.S. at 538).  Because there is
little in the factual record on these questions, it is
difficult for the Court to find that Shine's treatment was

_____

[2] Restrictive confinement based upon federal detainee status raises
both substantive and procedural questions.  While the Court dismissed
Shine's per se substantive due process argument, he may still be able to
plead a viable substantive due process claim based solely upon the
question of whether his placement in close custody, if triggered by his
status as a federal pre-trial detainee, was punitive.

*not* punishment. Given this record, the Court should reject the defendants' argument that Shine had no protected liberty interest in being free from special confinement.

Assuming that Shine had a protected liberty interest, the next question is whether he received appropriate process. If the purposes of enhanced confinement is disciplinary, the law requires written notice, adequate time to prepare a defense, a written statement of the reasons for the action taken, and a limited ability to present witnesses and evidence. Wolff v. McDonnell, 418 U.S. 539, 561-70 (1974). If the purpose is merely administrative, a detainee need only "receive some notice of the charges against him and an opportunity to present his views." Hewitt v. Helms, 459 U.S. 460, 476 (1983). Under either standard, Shine does not appear to have received adequate process. The Ashburn affidavit references a "close custody management team" that can review and alter a detainee's custody level. There is no mention of notice to the detainee as to why his custody level is being heightened, or of an opportunity to be heard. Accordingly, even under the more relaxed Hewitt standard, the DOC's procedures reflected in the record were constitutionally inadequate.

In the event the Court denies summary judgment on the procedural due process question, the defendants submit that they are entitled to qualified immunity. "The qualified-immunity doctrine shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 65 (2d Cir. 1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The determination of qualified immunity generally involves a two-step process. The Court will first determine whether the alleged facts demonstrate that the defendants violated a constitutional right. The Court will also consider whether the right was clearly established at the time of the alleged violation; that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). The Supreme Court has held that district courts are not required to analyze both points, and have the discretion to decide only the more narrow "clearly established" issue "in light of the circumstances in the

particular case at hand." Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

Based upon the record presented here, the Court should find that there are questions of material fact as to whether Shine's placement in close custody violated his constitutional rights. Whether those rights were clearly established, however, is another matter. Counsel for the defendants argues, presumably in good faith, that there are no Vermont laws or regulations setting forth procedural requirements for close custody. Directive 410.06 implies, but does not detail or require, a hearing process. Accordingly, the Court should not find that there was a clearly established liberty interest under state law.

As to the power of the Due Process Clause itself to create a liberty interest, the Second Circuit has not articulated whether the placement of a detainee in special custody automatically violates such an interest. Courts have stated that a detainee may not be punished without due process. Bell, 441 U.S. at 535 (detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law"); Resnick v. Hayes, 213 F.3d 433, 448 (9th Cir. 2000); Mitchell, 75 F.3d at 523. It is less

clear, however, whether such detention may be justified by legitimate penological interests, <u>Bell</u>, 441 U.S. at 538, or whether a detainee, when placed in special confinement for non-punitive reasons, has the same liberty interest. <u>See Benjamin</u>, 264 F.3d at 189 (citing with approval cases finding a liberty interest only in avoiding disciplinary segregation).

The DOC has established a process for determining how pre-trial detainees should be confined. While those procedures may not be lawful, the legal underpinnings of a protected liberty interest have not been clearly established. Accordingly, a reasonable officer operating under the DOC's "points" system should not have been expected to know that the system might be constitutionally flawed. For these reasons, I recommend that the Court GRANT the defendants' motion for summary judgment on the basis of qualified immunity.[3]

III. <u>Substantive Due Process</u>

A. Fire Sprinklers

The defendants next contend that, after the resolution

---

[3] Shine's request for injunctive relief on his procedural due process claim is moot because he is no longer incarcerated in Vermont. <u>See</u> <u>Salahuddin v. Goord</u>, 467 F.3d 263, 272 (2d Cir. 2006); (Paper 79) (notice of address change).

of their motion to dismiss, Shine has two remaining
substantive due process claims.  The first pertains to his
claim of inadequate fire protection.

The government has a constitutionally-imposed duty to
provide prisoners with a reasonably safe environment.  As
the Supreme Court has explained, "when the State by the
affirmative exercise of its power so restrains an
individual's liberty that it renders him unable to care for
himself, and at the same time fails to provide for his basic
human needs – *e.g.* . . . reasonable safety – it transgresses
the substantive limits on state action set by the . . . Due
Process Clause."  <u>DeShaney v. Winnebago County Dep't of
Social Servs.</u>, 489 U.S. 189, 199-200 (1989) (citation
omitted).  The Supreme Court has also held that, in cases of
environmental risks to prisoners, a prison condition is
actionable if it poses "an unreasonable risk of serious
damage to [the inmate's] future health."  <u>Helling v.
McKinney</u>, 509 U.S. 25, 32-34 (1993).

Courts have held that "[t]he absence of adequate and
reliable fire protection [in prisons] can give rise to a
Fourteenth Amendment Due Process claim."  <u>Benjamin v. Kerik</u>,
1998 WL 799161, at *4 (S.D.N.Y. Nov. 13, 1998); <u>see</u> <u>also</u>

Coniglio v. Thomas, 657 F. Supp. 409, 414 (S.D.N.Y. 1987) (collecting cases). However, where the inmate plaintiff "merely hypothesizes that in the event of a fire his life would be placed in jeopardy," a claim of inadequate fire protection has been deemed insufficient. Harrison v. Ienuso, 1995 WL 375915, at *2 (S.D.N.Y. June 23, 1995).

Shine has offered no support for his allegation that, because of inadequate sprinklers, "he would have perished in flames in a calamity before help could arrive." (Paper 4 at 6). While the Court accepted this claim as true and permitted it to go forward at the motion to dismiss stage, mere speculation is insufficient to survive a summary judgment motion. Conroy, 333 F.3d at 94. In response to Shine's grievance on the sprinkler issue, the investigating officer found (1) that Shine's unit was manned by staff 24 hours a day, seven days a week, (2) that the unit had smoke and heat detectors, and (3) that the unit had fire extinguishers. These facts are undisputed, and Shine has not offered any rebuttal evidence to show that, notwithstanding these precautions, he was nonetheless in danger. Consequently, summary judgment should be GRANTED on this claim.

B.   Ashburn's Liability For Burnham's Conduct

The defendants also move for summary judgment on Shine's claim that Superintendent Kevin Ashburn failed to protect him from Nick Burnham.  As Burnham's supervisor, Ashburn was allegedly aware that "Nick Burnham was a racist who hated blacks and who had previously assaulted another black inmate."  (Paper 4 at 8).  Ashburn's affidavit counters this allegation, stating:

> I had no reason to suspect that Officer Burnham
> might become involved in an altercation with Mr.
> Shine or any other inmate.  I am familiar with
> Officer Burnham's personnel file.  Officer Burnham
> had been employed as a correctional officer for
> more than 12 years at that time, and there were no
> indications in his personnel file that would
> suggest that Officer Burnham was either a racist
> or that he might have become violent toward an
> inmate, as Mr. Shine alleges.

(Paper 68-5 at 1).

In response to Ashburn's affidavit, Shine has submitted a letter from an investigator, Darla Lawton, at the Vermont Prisoner's Rights Office.  The letter is dated May 23, 2006 – several months after Burnham's alleged January 26, 2006 attack on Shine.  Lawton expresses to Ashburn her concern about "reports that CO II Nick Burnham engages in unprofessional behavior.  All the reports indicate that he swears at the inmates, calls them derogatory names and is

provocative." (Paper 73 at 3). The letter does not claim
or suggest that Burnham was physically abusive.

In order to hold a supervisor liable under § 1983, a
plaintiff must show that the defendant: 1) directly
participated in the challenged conduct; 2) after learning of
the violation through a report or appeal, failed to remedy
the wrong; 3) created or allowed to continue a policy or
custom under which unconstitutional practices occurred; 4)
was grossly negligent in managing the subordinate who caused
the unlawful event; or 5) failed to act on information
indicating that unconstitutional acts were occurring.
Iqbal, 490 F.3d 152-53. Shine's claim against Ashburn does
not meet any of these requirements.

Conclusory allegations that supervisors failed to train
or properly monitor the actions of a subordinate employee
will not suffice to establish the requisite personal
involvement and support a finding of liability. See Pettus
v. Morgenthau, 554 F.3d 293, 300 (2d Cir. 2009) ("To the
extent that [a] complaint attempts to assert a
failure-to-supervise claim . . . [that claim is insufficient
where] it lacks any hint that [the supervisor] acted with
deliberate indifference to the possibility that his

subordinates would violate [plaintiff's] constitutional
rights."). Moreover, the law in this Circuit is that a
plaintiff must allege sufficient facts to indicate that a
supervisor knew or should have known there was a "high
degree of risk" that his subordinate would behave
inappropriately, and either deliberately or recklessly
disregarded that risk. Poe v. Leonard, 282 F.3d 123, 12 (2d
Cir. 2002).

Shine's claim is that Ashburn should have protected him
from a correctional officer. The claim is not that Ashburn
actively permitted the officer's conduct, or that he knew
with the required level of certainty that the officer would
act as he did. Shine's conclusory allegations of deliberate
indifference are insufficient, and the motion for summary
judgment on this claim should be GRANTED.

IV. Retaliation

The defendants are also seeking summary judgment on
Shine's retaliation claims. The first such claim is that
defendant Modiano interfered with Shine's mail because Shine
had complained about the lack of fire sprinklers. At
summary judgment, Modiano has submitted an affidavit stating
that she "was not aware that Cassius Shine had requested a

grievance form regarding the lack of fire sprinklers.  He did not request a form from me, and no one informed me that he had requested a form from them."  (Paper 68-6).

To prevail on his retaliation claim, Shine must show: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  <u>Dawes v. Walker</u>, 239 F.3d 489, 492 (2d Cir. 2001), <u>overruled</u> <u>on other grounds</u>, <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506 (2002).  Here, the undisputed evidence is that Modiano was not aware of Shine's complaint.  Consequently, there was no causal connection between Shine's speech and Modiano's alleged actions, and this claim should be DISMISSED.

Shine next claims that defendants Hofmann and Blair transferred him to SSCF in retaliation for his grievance. The defendants' evidence, however, indicates that Shine was transferred because of construction at North West State Correctional Facility.  (Paper 68-7).  Moreover, according to Ray Flum, the DOC employee responsible for supervising the transfer of inmates, the DOC presents the U.S. Marshals with options for detention and the Marshals choose the

facility.  Id.  Accordingly, the undisputed evidence again shows no causal connection, and the defendants should be GRANTED summary judgment on this claim.

V.  Motion for Appointment of Counsel

Shine has submitted a motion for appointment of counsel.  His previous such motions were denied.  As a litigant in a civil case, Shine has no constitutional right to counsel.  See In re Martin-Trigona, 737 F.2d 1254, 1260 (2d Cir. 1984).  A court may "request an attorney to represent any person unable to afford counsel," 28 U.S.C. § 1915(e)(1), but cannot compel an attorney to accept a civil case pro bono.  Mallard v. U.S. Dist. Court for the S. Dist. of Iowa, 490 U.S. 296, 301-02 (1989).  Assignment of counsel in this matter is clearly within the judge's discretion.  In re Martin-Trigona, 737 F.2d 1254 (2d Cir. 1984).

The factors to be considered in deciding whether or not to assign counsel include (1) whether the indigent's claims seem likely to be of substance; (2) whether the indigent is able to investigate the crucial facts concerning his claim; (3) whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder; (4) whether the legal issues involved are

complex; and (5) whether there are any special reasons why appointment of counsel would be more likely to lead to a just determination. Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir. 1997); see also Hodge v. Police Officers, 802 F.2d 58 (2d Cir. 1986). The Court must consider the issue of appointment carefully, of course, because "every assignment of a volunteer lawyer to an undeserving client deprives society of a volunteer lawyer available for a deserving cause." Cooper v. A. Sargenti Co. Inc., 877 F.2d 170, 172 (2d Cir. 1989).

In support of his current motion, Shine submits that this case involves multiple legal claims and that his access to legal materials is limited by his incarceration. With respect to the first point, I am recommending that several of the pending legal claims be dismissed. Consequently, if this Report and Recommendation is adopted by the Court, the only remaining claim will be the allegation of an assault by a correctional officer. As to the question of Shine's access to legal materials, the docket indicates that he has been released from prison and is now in Florida. Accordingly, he may have improved access to legal resources, and appointment of counsel may no longer be warranted on

this ground.

The Court has no reason to doubt the merits of Shine's claim of assault.  The facts surrounding that assault, however, appear to be discrete, involving a single incident and only two individuals.  Accordingly, the issues to be tried do not appear to be overly complex.  Furthermore, Shine may have more success in retaining counsel now that the case has been simplified.  See Cooper, 877 F.3d at 172 (court may consider effort by plaintiff to obtain a lawyer in determining whether to appoint *pro bono* counsel).

The motion for appointment of counsel (Paper 62) is, therefore, DENIED without prejudice.  As this case approaches trial, the trial judge may wish to re-visit the issue of appointed counsel either *sua sponte* or upon another motion by the plaintiff.

VI.  Pre-Trial Motions

Finally, Shine has filed two pre-trial motions.  The first (Paper 61) requests a pre-trial conference and raises several issues relevant to trial.  Those issues include the need for witness subpoenas, a request that the Court subpoena a videotape pertaining to the Burnham incident, and Shine's claim that his deposition should have been

continued.[4]  The motion also attaches a petition for a writ

of habeas corpus *ad testificandum* (Paper 61-2) such that

Shine can be transported to trial by the Department of

Corrections.  Shine's second pre-trial motion (Paper 63)

seeks an *in limine* ruling on the admissibility of both his

prior criminal convictions and Burnham's prior misconduct.

Motions presented prior to trial pertaining to the

course and content of trial are best ruled upon by the judge

who will be presiding.  While this case is scheduled to be

ready for trial, no trial date has been set.  Rather than

allow Shine's motions, filed several months ago, to linger

on the docket while the case awaits its next phase, it is

preferable to ask him to resubmit *all* pre-trial motions at a

time set by the presiding trial judge.  Assuming that a pre-

trial conference will be held at the appropriate time, if

the trial judge deems such a conference necessary, Shine's

motion for a pre-trial conference is DENIED without

prejudice.  Similarly, his motions with respect to *in limine*

matters are DENIED without prejudice, but may be raised

again before the trial court.

---

[4]  It does not appear from the docket that any continuance was requested at the time of the deposition.

## Conclusion

For the reasons set forth above, I recommend that the defendants' motion for partial summary judgment (Paper 68) be GRANTED, and that all claims be DISMISSED with the exception of claims relating to the alleged assault by Defendant Burnham.  Shine's motions for a pre-trial conference (Paper 61), for appointment of counsel (Paper 62), and motion *in limine* (Paper 63) are DENIED without prejudice.

Dated at Burlington, in the District of Vermont, this 17th day of June, 2009.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge


Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  Failure to file objections within the specified time waives the right to appeal the District Court's order. See Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).